UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MAB Industries Corporation,**

      **Plaintiff,**                        **Case No. 2:23-cv-3083**

      **v.**                             **Judge Michael H. Watson**

**Channingway Center LLC,**          **Magistrate Judge Vascura**

      **Defendant.**

## OPINION AND ORDER

MAB Industries Corporation ("MAB") sued Channingway Center LLC ("Channingway") in November 2022, alleging several claims stemming from an agreement to buy property.  Subsequently, Channingway asserted a counterclaim for a declaratory judgment against MAB.  Channingway also levied the same declaratory judgment claim against a third party—namely, Mark Bauman ("Bauman"), MAB's sole owner who executed the pertinent property agreements.

Channingway now moves for summary judgment on (1) MAB's claims against it, and (2) its declaratory judgment request as to MAB and Bauman.  ECF No. 47.  Additionally, MAB and Bauman ask the Court to strike certain evidence that Channingway submitted with its summary judgment briefing.  ECF No. 55.

For the reasons below, Channingway's motion for summary judgment, ECF No. 47, is **GRANTED in part** and **DENIED in part**.  MAB and Bauman's motion to strike, ECF No. 55, is **DENIED as moot**.

## I.    FACTUAL BACKGROUND

This matter relates to the property situated at 6100 and 6056 Channingway Boulevard, Columbus, Ohio 43232 (the "Property").

### A.    Bauman locates and bids on the Property.

In early 2021, Bauman became interested in purchasing commercial property in Columbus, Ohio.  Bauman Dep. 59:3–14, ECF No. 46-1.  Bauman reviewed various properties using an online auction platform hosted by Ten-X (an internet auction business) before finding the Property listed for sale.  *Id.* at 64:2– 11; ECF No. 46-6 at PAGEID # 818.  Ten-X maintained a due diligence portal that housed documents to apprise potential buyers of the Property's condition. *Id.* at 65:5–10.  Bauman reviewed materials on Ten-X's portal, including certain leases, court documents, the rent roll, and a condition report.  *Id.* at 67:11–19, 73:15–21, 148:4–13; *see also* ECF No. 46-7 (condition report).  Bauman was excited to bid on the Property.  Bauman Dep. 71:12–15, ECF No. 46-1.

Along with a diligence portal, Ten-X offered its users and potential bidders a reference sheet, which Bauman "probably . . . glanced at" before bidding on the Property.  Bauman Dep. 91:4–15, ECF No. 46-1; ECF No. 46-9.  The reference sheet, titled "Auction Keys to Success," indicated that "all property due diligence must be done PRIOR TO AUCTION" and that "[t]here are no closing contingencies for due diligence or inspections/tours."  ECF No. 46-9 at PAGEID # 901 (emphasis in original).  In line with these points, Bauman presumed that he would be bidding on the Property "as-is," and he did not make an in-person visit

to the Property before bidding. Bauman Dep. 52:4–13, 93:13–19, ECF No. 46-1. The reference sheet also noted that bidders "must provide and upload proof of cash or cash equivalents . . . in the amount of [their] anticipated maximum bid for each sale" and that those liquid funds "must be available immediately without restriction." ECF No. 46-9 at PAGEID # 901. Bauman understood this requirement and knew, prior to bidding on the Property, that the contract would not include a financing contingency. Bauman Dep. 94:9–95:1, ECF No. 46-1. Bauman also understood that if he was the winning bidder, his bid to buy the Property would be binding. *Id.* at 95:2–15; *see also* ECF No. 46-9 at PAGEID # 901 ("Your bids are binding so please make sure you have done your due diligence before bidding[.]").

Hours before Bauman placed his bid, Ten-X provided him with the title commitment for the Property, which disclosed, as an exception, the existence of a pending state-court environmental lawsuit ("State-Court Action") against the Property. Bauman Dep. 52:14–22, 115:10–116:16, 117:19–118:7, 134:4–12, ECF No. 46-1; ECF No. 46-12. The title commitment also indicated that the state court had issued an injunction setting forth various restrictions on the Property's use and condition.[1] ECF No. 50-2 at PAGEID ## 1386–95. The basis for the injunction was the state court's finding that the Property constituted a public

_____

[1] Channingway had notice of the injunction several days before Bauman. *See* ECF No. 50-2 at PAGEID # 1398. Channingway chose not to "provide any further disclosures other than that which is already disclosed on the title" commitment for the Property. *Id.*

nuisance subject to abatement.  *Id.* at PAGEID # 1388.  Specifically, between January 2019 and March 2021, the Columbus Division of Police ("CPD") responded to over 350 calls to the Property for firearm and drug-related concerns.  *Id.* at PAGEID # 1387.  CPD officers observed multiple illegal tobacco, alcohol, and narcotics transactions during that time, and more than one homicide occurred on the Property in the summer of 2020.  *Id.*  As a result, the injunction permanently enjoined Channingway and other successors in title from, *inter alia*, permitting the Property to be used as a public nuisance.  *Id.* at PAGEID # 1390.  Bauman read the injunction prior to bidding, but nothing therein dissuaded him from bidding.  Bauman Dep. 123:14–16, 130:8–14, ECF No. 46-1.

Ten-X approved Bauman to bid on the property.  Bauman Dep. 108:14–109:4, ECF No. 46-1.  So, on March 24, 2021, Bauman placed his first bid for the Property in the amount of $1.45 million.  *Id.* at 132:4–13; ECF No. 46-13.  Although Bauman was ultimately not the top bidder at the auction, Ten-X informed him that the City of Columbus had rejected the top bidder as a purchaser.  *Id.* at 137:20–138:7, 144:3–17; *see* ECF No. 50-2 at PAGEID # 1390.  Thereafter, Channingway returned to Bauman with the option to purchase the Property, and the City of Columbus approved.  Bauman Dep. 144:13–17, 170:20–22, ECF No. 46-1.

**B.**    **Bauman and Channingway execute an agreement for the sale of the Property.**

On April 9, 2021, Bauman and Channingway entered into a Purchase and Sale Agreement ("PSA"), under which Bauman agreed to buy the Property from Channingway for $2,369,000.00.  Bauman Dep. 147:8–148:3, ECF No. 46-1; PSA, ECF No. 46-16.  Bauman signed the PSA in his individual capacity.  PSA, ECF No. 46-16 at PAGEID # 926.  Bauman did not conduct any additional diligence on the Property between the City of Columbus's rejection of the other bidder and his execution of the PSA.  Bauman Dep. 148:4–18, ECF No. 46-1.

Pursuant to the PSA, Bauman made an initial earnest money deposit of $236,900.00.  Bauman Dep. 169:7–17, ECF No. 46-1.  The earnest money deposit was presumptively non-refundable under the PSA's terms.  PSA, ECF No. 46-16 at PAGEID # 926 ("The Earnest Money Deposit is non-refundable except as set forth in this Agreement.").  One exception to non-refundability was "[i]f Seller is the breaching party."  *Id.* at PAGEID # 928.  In such a situation, the buyer would also "be entitled to pursue remedies at law or in equity."  *Id.*

Pertinent here, Channingway provided the following representation and warranty as part of the PSA, Section 10(D):

> Except for the leases (including any amendments[)] listed in Exhibit C ("Leases"), Seller knows of no other agreement with respect to the occupancy of the Property that will be binding on Buyer after Closing, and to Seller's knowledge, the information on Exhibit C and copies of any Leases delivered by Seller to Buyer are true, correct and complete in all material respects.

PSA, ECF No. 46-16 at PAGEID # 929.  Bauman's obligation to close was conditioned on, *inter alia*, the representation's truth.  *Id.* at PAGEID # 927. Moreover, on or before the Closing Date,[2] Channingway had a duty to deliver to the Closing Agent "[a]ny and all other instruments reasonably required by Closing Agent or otherwise necessary to Close the transactions contemplated by [the PSA]."  *Id.* at PAGEID # 926 (Section 4(A)(v)).

If a party "learn[ed] that a closing condition [wa]s unlikely to be satisfied," the PSA (Section 5(C)) required that party to "promptly notify the other party," after which the parties must "cooperate in good faith to fairly and promptly resolve the matter."  PSA, ECF No. 46-16 at PAGEID # 927.

## C.    The parties enter into the First Addendum to the PSA.

The PSA included an Extension Option Addendum, which gave Bauman the option to extend the Closing Date in exchange for an additional deposit in an amount equal to 5% of the purchase price.  PSA, ECF No. 46-16 at PAGEID # 925.  The funds were characterized as "an increase in the Earnest Money Deposit for all purposes under the Agreement."  *Id.*

Bauman first invoked the extension option in May 2021.  In response to the Closing Agent's question about the status of Bauman's financing, Bauman

---

[2] The PSA defines "Closing Date" as the date by which "[t]he transactions contemplated by [the PSA] shall be consummated[.]"  PSA, ECF No. 46-16 at PAGEID # 210.  The PSA included a line for the parties to insert the Closing Date of their choosing, but the line was left blank.  *Id.*  If the line was left blank, the Closing Date defaulted to thirty calendar days after the PSA's effective date.  *Id.*  However, the parties extrinsically determined that the Closing Date would instead be June 1, 2021.  Bauman Dep. 171:18–20, ECF No. 46-1.

indicated that his lender's appraiser was delayed in completing an appraisal of the Property.  ECF No. 46-18 at PAGEID ## 951–52.  A few days later, the Closing Agent confirmed to Ten-X, Bauman, and others via email that "[a]ll requirements [for Closing] on the seller[']s side have been satisfied."  ECF No. 46-19 at PAGEID # 972.  Ten-X then reached out to Bauman and asked whether he planned to timely close or whether he wanted an extension.  ECF No. 46-20 at PAGEID # 983.  Because the appraisal—which was necessary to obtain a Small Business Administration ("SBA") loan[3]—was incomplete, Bauman expressed his desire to extend the Closing Date.  *Id.* at PAGEID # 982; Bauman Dep. 186:14–21, ECF No. 46-1.

Consequently, Bauman and Channingway entered into an addendum to the PSA, dated May 27, 2021 ("First Addendum").  ECF No. 46-21.  The First Addendum extended the Closing Date to July 8, 2021.  *Id.* at PAGEID # 986.  Bauman deposited $118,450.00 with the Closing Agent, which was considered "an increase in the Earnest Money Deposit for all purposes under the Agreement."  *Id.*

---

[3] Prior to bidding, Bauman did not have sufficient funds to pay for the Property in cash. Bauman Dep. 100:20–22, ECF No. 46-1.  An Ohio SBA lender, however, pre-approved a loan (up to $3 million) for Bauman to bid on the Property.  ECF No. 46-6 at PAGEID ## 818–19.  A company called Harvest served as Bauman's SBA lender.  Bauman Dep. 72:10–18, 86:1–7, ECF No. 46-1; ECF No. 46-28.  Bauman sought an SBA loan to fund the acquisition of the Property because he wanted to "have less cash out" and obtain a loan at a lower rate.  *Id.* at 88:22–89:5.

To induce Channingway to give additional time, Bauman's original, non-refundable $236,000.00 earnest money deposit was released to Channingway to go toward the purchase price for the Property. *Id.* ("Closing Agent is authorized and instructed to immediately pay to Seller an amount equal to $236,900.00 from the Earnest Money Deposit, which payment shall be nonrefundable, may be retained by Seller in all circumstances, and shall constitute a decrease in the Earnest Money Deposit for all purposes under the Agreement . . . . At closing, such payment shall . . . constitute a credit towards the Purchase Price."). Thus, after the Closing Agent paid Channingway the existing $236,900.00 and Bauman made his $118,450.00 deposit, the earnest money account held $118,450.00. Bauman Dep. 183:17–20, ECF No. 46-1.

The day after executing the First Addendum, Bauman assigned his rights and obligations under the PSA to MAB. ECF No. 7-2 at PAGEID ## 265–66. Despite the assignment, he remained personally obligated thereunder. *Id.* ("Notwithstanding anything to the contrary herein or in the Agreement, Buyer shall remain liable for all obligations and duties of Buyer under the Agreement.").

**D.      The parties enter into the Second Addendum to the PSA.**

Throughout June 2021, the parties worked toward closing, but Bauman's lender continued to experience delays in approving the SBA loan. Bauman Dep. 205:2–13, ECF No. 46-1. Bauman was also coordinating with Channingway to address necessary repairs for the Property. ECF No. 46-24 at PAGEID # 1015.

Separately, on June 12, 2021, a patron of the strip club on the Property was stabbed and killed while in the club.  ECF No. 50-2 at PAGEID # 1433; Bauman Dep. 53:24–54:4, ECF No. 46-1.  Bauman maintains that Channingway knew about the incident but did not contemporaneously inform him of the same. Bauman Dep. 20:21–21:11, ECF No. 46-1.

On June 28, 2021, Channingway emailed the parties and asked what was needed from it to timely close.  ECF No. 46-24 at PAGEID # 1013; Friedman Decl. ¶ 4, ECF No. 47-1.  The Closing Agent replied that "Seller has satisfied all title requirements at this time" but that "an updated rent roll close to closing" would be needed.  ECF No. 46-24 at PAGEID # 1013.  The Closing Agent subsequently sent Channingway a closing packet, which Channingway pre-signed and returned to the Closing Agent.  *See* ECF No. 46-25; ECF No. 46-26 at PAGEID # 1032 ("The seller has pre-signed their closing documents and they are being held in escrow.").

The day before closing was to occur (July 7, 2021), the Closing Agent emailed the parties and stated that he did not have what he needed "to close this tomorrow."  ECF No. 46-26 at PAGEID # 1032.  The Closing Agent explained that he had not "received lender instructions, loan amount, coverage requests, etc. for the buyer."  *Id.*; *see also* ECF No. 46-27 at PAGEID ## 1037–40 (repeated requests by the Closing Agent to the SBA lender for title order or closing instructions).  At that point, the parties were waiting on Bauman's SBA lender.  Bauman Dep. 204:8–205:13, ECF No. 46-1 ("Q.  Okay.  So as of July

7th, it sounds like the lender hadn't received all the documents that they had wanted to underwrite the deal?  A. . . . They kept asking for more things.").

But, later that day, the SBA lender verified that the commitment letter for the loan had been issued and informed the Closing Agent that "[t]o close[,] the loan we will need an extension of 30 days."  ECF No. 46-27 at PAGEID ## 1036–37; ECF No. 46-28 (commitment letter).  So, Channingway and Bauman (on behalf of MAB) executed a second addendum to the PSA ("Second Addendum"), dated July 12, 2021.  ECF No. 46-29.  The Second Addendum extended the closing date to July 26, 2021.  *Id.* at PAGEID # 1074.  Bauman's earlier payment of $118,450.00 pursuant to the First Addendum, which comprised the balance of the earnest money account, was released to Channingway to go toward the purchase price of the Property.  *Id.*

The Second Addendum also gave Bauman/MAB "the option to further extend the Closing to a date no later than August 20, 2021."  *Id.* at 1075.  To take advantage of the extension option, Bauman/MAB were required to (1) notify Channingway by July 21, 2021; (2) deposit with the Closing Agent an additional, non-refundable earnest money deposit of $118,450.00; and (3) pay a daily fee of $1,000.00 from July 26, 2021, until the earlier of August 20, 2021, or the Closing Date.  *Id.*  Lastly, the Second Addendum included a provision stating that "Buyer hereby accepts the property in its 'AS IS, WHERE IS' condition on this date or on the date of closing" and that "Buyer hereby acknowledges that Seller has

satisfied all of its obligations and Seller shall have no further obligations to Buyer." *Id.*

### E. The parties enter into the Third Addendum to the PSA.

Although Bauman/MAB had the means to close on the Property with cash by July 21, 2021 (the notification deadline for another closing extension), they preferred to close with loan funding because they had invested considerable time and expense into obtaining the loan. *Id.* at 242:18–243:13. After the execution of the Second Addendum, though, the SBA lender experienced further delays in approving the loan. Bauman Dep. 239:4–12, 242:12–22, ECF No. 46-1. Meanwhile, on July 20, 2021, the City of Columbus moved in the State-Court Action to hold Channingway in contempt of court based on the June 2021 murder that occurred on the Property. ECF No. 50-2 at PAGEID # 1432.

On July 22, 2021, the Closing Agent confirmed via email that the only item he needed "from the selling side is an updated rent roll for July and an update on the security deposit credit, if any." ECF No. 50-2 at PAGEID # 1443. Channingway responded and attached the materials. *Id.* Both the Closing Agent and Channingway then asked Bauman if the plan was still to close on July 26, 2021. *Id.* at PAGEID ## 1442–43; *see also* Bauman Dep. 240:18–22, ECF No. 46-1 ("Q. Do you have any information to suggest that Channingway was not ready, willing and able to close on the sale on July 26th? A. I'm sure they were ready to take our money."). Bauman/MAB were not ready to close on July 26, however, because the SBA lender had not released financing. Bauman Dep.

242:12–22, ECF No. 46-1; ECF No. 50-2 at PAGEID # 1442 ("The lender as Title was informed[,] said they wouldn't be able to fund [until] the 30th . . . [s]o please prepare for a close for the 30th[.]").  As such, and pursuant to the terms of the Second Addendum, Bauman/MAB deposited with the Closing Agent an earnest money deposit of $118,450.00 to extend the closing date to August 2021.[4]  ECF No. 50-2 at PAGEID # 1441.

Channingway, though, did not believe that Bauman/MAB had provided timely notice of their desire for an extension, as required by the Second Addendum.  ECF No. 50-2 at PAGEID # 1441.  Channingway thus told Bauman that another amendment would be necessary.  *Id.* ("[A]t this point[,] we are technically out of contract and another amendment is required to remedy that.").  Bauman disagreed with Channingway's position but was amenable to another addendum, though he asked to use September 1, 2021, as the Closing Date, and Channingway agreed.  *Id.* at PAGEID # 1436.

While the parties were negotiating another addendum, Bauman requested from Channingway complete copies of leases for several of the Property's tenants, which he needed to secure the SBA loan.  ECF No. 50-2 at PAGEID ## 1435–36.  Bauman also asked if one of the tenants listed on the rent rolls was still a current tenant.  *Id.*  As to these issues, Bauman inquired whether "there will

---

[4] It is unclear whether (and if so, for how long) Bauman/MAB were required to pay the daily $1,000.00 penalty.  *See* ECF No. 50-2 at PAGEID # 1442 ("So per our extension we'll have the deposit in by Monday as agreed and the $1k a day starting the 27th can be deducted from there.").

be any delays with any of those in providing them and why those weren't provided originally." *Id.*

Channingway replied that it would respond to Bauman's questions and provide "whatever" it had but only after the parties executed the addendum. *Id.* According to Bauman, Channingway did not advise him or MAB of the June 2021 murder or the contempt motion in the State-Court Action. Bauman Dep. 21:3–21, ECF No. 46-1; ECF No. 46-38 at PAGEID # 1154 ("Furthermore, we've received a copy of the motion . . . and you were informed of this, and did not inform us of the proceedings[.]").

Shortly thereafter, the parties entered into a third addendum, dated August 4, 2021 ("Third Addendum"). ECF No. 46-34. The Third Addendum extended the Closing Date to September 1, 2021. *Id.* at PAGEID # 1122. Like the other addenda, the Third Addendum required the Closing Agent to release another $118,450 in earnest money to Channningway to be paid toward the purchase price. *Id.* Following that transfer, the earnest money account contained $0 because the Third Addendum did not require Bauman to deposit additional funds into the earnest money account. *Id.*; Bauman Dep. 245:5–8, ECF No. 46-1.

**F.      The parties fail to close on the Property by September 1, 2021.**

Soon after the parties executed the Third Addendum, the Closing Agent requested from Channingway the original leases for certain tenants, including J.W. Hickey, OHM International, Trish Wright, and Kenneth McDonald d/b/a Barber Shop. ECF No. 50-2 at PAGEID # 1446. Channingway produced leases

for Trish Wright and Barber Shop but acknowledged that it did not have leases for J.W. Hickey or OHM International.  *Id.*  The Closing Agent then advised that the parties were "in between a rock and a hard place without copies of the original J.W. Hickey lease or the OHM international leases" because neither "the buyer[']s lender nor title can move forward with the SNDA's[5] until we see copies of those leases" (though the Closing Agent later clarified that only the J.W. Hickey lease was needed).  *Id.* at PAGEID # 1445.

The Closing Agent also told Channingway that the lease for a specific tenant (Bresco) did not have subordination language, meaning that the Closing Agent needed an SNDA from Bresco, as well as any other tenant whose lease lacked subordination language.  ECF No. 50-2 at PAGEID # 1446.  Channingway took the position that the sale of the Property was "not contingent on buyer obtaining financing nor on Seller providing anything else that wasn't provided previously."  *Id.*  Nevertheless, Channingway agreed to forward an SNDA to Bresco if one was provided by Bauman/MAB.  *Id.*

A few days later, the Closing Agent contacted Channingway again and explained that the J.W. Hickey and Bresco leases needed to be amended to include subordination language.  ECF No. 51-2.  The Closing Agent subsequently sent Channingway SNDAs and some lease amendments.  ECF No. 46-38 at PAGEID ## 1159–60.  Channingway replied that it would "try to

_____

[5] "SNDA" stands for subordination, non-disturbance, and attornment agreement.

accommodate with these last-minute documents," but it expressed doubt as to whether the documents could be completed by the Closing Date, so it "strongly advise[d] Buyer to prepare for a closing without these documents" and emphasized that "buyer will still be obligated to close per the contract" even if the documents were incomplete. *Id.*

During this time, Bauman/MAB were still awaiting approval of the SBA loan. Bauman Dep. 258:9–16, ECF No. 46-1. The SBA lender needed information about (and copies of) various leases, including whether they contained subordination language. *Id.* at 257:18–21; ECF No. 46-33 at PAGEID ## 1107–08. However, Channingway failed to produce the leases and information needed. Bauman Dep. 258:9–16, 259:1–9, ECF No. 46-1; *but see* ECF No. 46-38 at PAGEID ## 1155–56 (email from Channingway to Bauman stating that "[a]ll documents received from the Tenants have been sent to [the Closing Agent]. I've also attached them here so that you have it [sic]. Other documents have previously been provided and uploaded to the [T]en-[X] site as part of the due diligence process prior to the auction").

In late August, Bauman was informed that the State-Court Action involving the Property had been reopened. ECF No. 46-38 at PAGEID # 1156. Channingway did not plan to participate in the State-Court Action. *Id.* at PAGEID # 1155 ("I spoke with the City Attorney and they do not intent [sic] on pursuing any additional action against Channingway."). However, the Closing Agent told Bauman that the SBA lender "cannot proceed to closing" until the exception on

the title commitment surrounding the injunction was removed and the entire State-Court Action was dismissed.  ECF No. 46-37 at PAGEID # 1144. Consequently, Bauman wrote to Channingway that "[i]n light of the recent case being reopened by the city, and the information surrounding the unmarketability of the title, we need to pause this transaction until this can be resolved, or we know the outcome of the upcoming hearing." *Id.* at PAGEID # 1154.  Bauman noted, though, that he was "open" to a return of the earnest money deposit if Channingway wanted to sell the Property to someone else.  *Id.*

Channingway was not open to "pausing" the sale of the Property or selling to someone else.  Rather, Channingway posited that (1) it had already disclosed the existence of the State-Court Action as part of the auction diligence process; (2) neither the PSA nor any of the addenda contained a financing contingency, such that MAB/Bauman were required to close regardless of whether they could obtain an SBA loan; and (3) the closing must occur on September 1, 2021, as agreed or the earnest money deposit—which totaled $473,800.00—would be forfeited.  ECF No. 46-38 at PAGEID # 1154.

## II.    PROCEDURAL HISTORY

The Property's closing never took place.  The parties instead participated in mediation to attempt to resolve their dispute (as contemplated by the PSA). Sofer Dep. 94:20–24, ECF No. 50-1; PSA, ECF No. 46-16 at PAGEID # 930. When mediation was unsuccessful, MAB sued Channingway in this Court in November 2022 and asserted one claim for breach of contract.  ECF No. 1.  MAB

later amended its Complaint to add claims for unjust enrichment, fraud, and declaratory relief. *See* First Am. Compl. ("FAC"), ECF No. 7.[6] MAB seeks recovery of the earnest money deposits, punitive damages, attorneys' fees, interest, and costs. *Id.*

Channingway moved to dismiss MAB's Amended Complaint. ECF No. 11. The Court granted in part and denied in part Channingway's motion. O&O, ECF No. 27. The Court dismissed with prejudice MAB's breach-of-contract claim but only to the extent that the claim was based on Channingway's refusal to return earnest money. *Id.* at PAGEID # 403. The Court otherwise allowed MAB's claims to proceed. *Id.*

Shortly thereafter, Channingway filed its Answer to the FAC. ECF No. 31. Therein, Channingway brings a declaratory judgment claim against MAB and Bauman. *Id.* ¶¶ 10–13. Channingway seeks a declaration that it is the prevailing party in this case and that it is entitled to reasonable attorneys' fees and costs. *Id.* ¶ 13.

Following the close of discovery, Channingway moved for summary judgment, ECF No. 47. MAB and Bauman opposed summary judgment, ECF No. 51, and Channingway replied, ECF No. 54. MAB and Bauman then moved

---

[6] MAB failed to comply with this Court's local rules when it initially filed its Amended Complaint, *see* ECF Nos. 5–6, but MAB remedied this error upon refiling, *see* FAC, ECF No. 7. Consequently, when referring to MAB's Amended Complaint, the Court refers to ECF No. 7.

Case No. 2:23-cv-3083

to strike a declaration and two exhibits that Channingway offered with its Reply. ECF No. 55. Both motions are fully briefed and ripe for the Court's consideration.

### III.  MOTION TO STRIKE

In support of its summary judgment motion, Channingway submitted a declaration by its asset manager, Joel Friedman ("Friedman"), who managed the Property during the relevant time. *See* First Friedman Decl., ECF No. 47-1. Channingway attached a second declaration from Friedman to its Reply. *See* Sec. Friedman Decl., ECF No. 54-1. MAB and Bauman, however, contend that this second declaration "introduces new evidence," so they urge the Court to strike it, the exhibits thereto, and any arguments in reliance thereon. *Id.*

### A.  Standard of Review

Motions to strike arguments are generally disfavored. *See O'Banion v. Am. Aggregates Corp.*, No. 1:19-CV-841, 2020 WL 13469259, at *2 (S.D. Ohio July 23, 2020); *Reeser v. Henry Ford Hosp.*, 695 F. App'x 876, 881 (6th Cir. 2017) ("A motion to strike may at times be warranted . . . [b]ut the motion is not a tool to strike words, sentences, or even arguments from an opponent's brief."). Whether to strike a document other than a pleading is within the trial court's sound discretion. *O'Banion*, 2020 WL 13469259, at *1.

As relevant here, "affidavits that respond only to the opposing party's brief are properly filed with the [R]eply brief." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 476 (6th Cir. 2002). The Federal Rules also permit "rebuttal evidence attached to a Reply." *Omega Cable & Comm., Inc., v. Time Warner, Inc.*, No.

5:05CV1780, 2008 WL 163613, at \*4 (N.D. Ohio, January 16, 2008).  If an affidavit submitted with a Reply presents new evidence that should have been attached to the original motion, "the district court should permit the nonmoving party to respond to the new matters prior to the disposition of the motion . . . or else strike that new evidence."  *Lentz v. City of Cleveland*, No. 1:04 CV 669, 2011 WL 13294990, at \*2 (N.D. Ohio Sept. 30, 2011) (citations omitted).  But, where the affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for the entry of summary judgment, reply papers—both briefs and affidavits—may properly address those issues."  *Omega Cable & Comm.*, 2008 WL 163613, at \*1 (internal quotation marks and citation omitted).

**B.    Analysis**

Summary judgment motions are meant to "define disputed facts and issues and to dispose of unmeritorious claims."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  In this case, though, the scope of the parties' dispute is not immediately clear.  So, the Court must first determine which matters have been properly placed at issue on summary judgment before it may evaluate the appropriateness of Friedman's second declaration and its exhibits.

Channingway moves for summary judgment on MAB's breach-of-contract claim, arguing that it should prevail on four of Plaintiff's theories of breach: (1) the failure to produce all documents, in violation of Section 4(A)(v) of the PSA; (2) the production of fraudulent documentation related to the Property's

occupancy and financial viability, in violation of Section 5(B)(i); (3) the failure to cooperate in good faith, in violation of Section 5(C); and (4) the untruthfulness of all representations, in violation of Section 5(B)(i). ECF No. 47 at PAGEID # 1173. These theories appear both in the FAC and in MAB's discovery responses. *See* ECF No. 46-3 at PAGEID # 800; FAC ¶¶ 29–31, 37–39, 73, ECF No. 7. MAB meaningfully responds to Channingway's arguments on two of these theories in its opposition,[7] but MAB also condemns Channingway's conduct as violative of Section 10(D), 11(D), and 11(F).[8] *See* ECF No. 51 at PAGEID ## 1513–17. Although allegations surrounding Section 10(D) are present in the FAC, *see* FAC ¶¶ 41, 72, 75–76, ECF No. 7, MAB asserts Sections 11(D) and 11(F) as new manners in which Channingway allegedly breached the PSA for the first time in its opposition.

But a party cannot oppose summary judgment by "asserting new claims" or by "asking to develop a new claim that does not appear in the pleadings."

---

[7] MAB invokes Section 5(B) in its opposition but only in the context of arguing that this section excuses MAB's performance due to Channingway's breaches. *See generally id.*

[8] The Court previously held that MAB had stated a breach-of-contract claim under Section 12 of the PSA related to Channingway's mediation conduct, O&O, ECF No. 27, and MAB answered—in the same discovery responses that Channingway relied on to inform the scope of its summary judgment arguments—a request for admission as to that theory, ECF No. 46-3 at PAGEID # 796. Yet neither side briefed (or even raised) that theory on summary judgment. *See generally* ECF Nos. 47, 51, 54. Thus, the parties have not pursued MAB's breach-of-contract claim (insofar as it is based on Section 12) at the summary judgment stage, so it must await later resolution. *See, e.g.,* *Fields v. BasTech, Inc.*, No. 3:19-CV-135, 2020 WL 3173145, at *2 (S.D. Ohio June 15, 2020) ("Plaintiff alleges other claims in his complaint, but those claims are not at issue in his motion for summary judgment and, therefore, remain pending for trial.").

*McKenna v. Dillon Transportation, LLC*, 97 F.4th 471, 477 (6th Cir. 2024). Indeed, "[t]he Sixth Circuit does not allow parties to advance new contentions in opposition to a summary judgment motion after ample time for discovery and amending the complaint." *Ohio Ass'n of Elementary Sch. Adm'rs v. Educ. Impact, Inc.*, No. 2:11-CV-068, 2013 WL 992219, at *6 (S.D. Ohio Mar. 13, 2013) (citations omitted). Similarly, "[p]arties are not entitled to use discovery 'to develop new claims or defenses that are not already identified in the pleadings.'" *McKenna*, 97 F.4th at 477 (citing "Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2000 amendment").

In this case, MAB added new theories of Channingway's liability in its summary judgment opposition. Specifically, Section 11(D) cabins Channingway's ability to enter into or terminate leases prior to closing, *see* PSA, ECF No. 46-16 at PAGEID # 930, and MAB maintains on summary judgment that Channingway breached this provision, ECF No. 51 at PAGEID ## 1514–15. Additionally, Section 11(F) concerns Channingway's disclosure of changes to the Property's condition, *see* PSA, ECF No. 46-16 at PAGEID # 930, and MAB contends that Channingway breached this provision when it failed to update its disclosures after a murder occurred on the Property, ECF No. 51 at PAGEID ## 1515–17.

But Sections 11(D) and 11(F) appear nowhere in the FAC (or the mediation statement incorporated by reference, *see* ECF No. 7-2). Nor does MAB lodge allegations therein about Channingway entering into (or terminating)

leases before closing or neglecting to disclose the murder in violation of the PSA. True, MAB asserts breaches of other PSA sections by virtue of Channingway's other conduct, but "the fact that [MAB] pled some breach of contract claim is not sufficient to allow the company to move forward with new breach of contract claims based on different facts and allegations." *Ohio Ass'n of Elementary Sch. Adm'rs*, 2013 WL 992219, at *10 (citation omitted).  In other words, MAB may not assert new bases for Channingway's breach of contract (or fraud or unjust enrichment, for that matter) in opposing summary judgment, and the Court will not consider these allegations or Channingway's Reply to the same.

Even so, properly at issue on summary judgment are MAB's allegations—contained in the FAC—surrounding (1) Channingway's failure to accurately identify tenants and provide leases and other materials, in violation of Sections 4 and 10(D) of the PSA; (2) Channingway's refusal to negotiate in good faith, in violation of Section 5(C); and (3) the effect of Section 5(B) on MAB's obligation to perform.  Having established the scope of these proceedings, the Court now turns to Channingway's Reply evidence.

Because MAB and Bauman may not avoid summary judgment by asserting (for the first time) liability against Channingway for modifying leases before closing or failing to disclose the murder, the Court need not consider the portions of Friedman's declaration dedicated to those assertions.  *See* Sec. Friedman Decl. Ex. A, ¶¶ 5, 10, ECF No. 54-1.  As to the remaining statements and exhibit in Friedman's second declaration, the Court does not rely on the

same in ruling on Channingway's motion for summary judgment.  Thus, MAB and Bauman's motion to strike, ECF No. 55, is **DENIED as moot**.

## IV.     MOTION FOR SUMMARY JUDGMENT

## A.     Standard of Review

The standard governing summary judgment is set forth in Federal Rule of Civil Procedure 56(a): "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

The Court must grant summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case" and "on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing there is a genuine dispute of material fact for trial, and the Court must refrain from making credibility determinations or weighing the evidence.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 255 (1986).  The Court disregards "all evidence favorable to the moving party that the jury would not be required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (citation omitted).  Summary judgment will "not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248 (internal citations and quotation marks omitted).

Where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, the party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted); *Alpha Enters. v. Tomato Land Display Sys.*, 92 F. Supp. 2d 733, 736 (S.D. Ohio 2000). In other words, "[w]hen the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden." *Ely v. Dearborn Heights Sch. Dist. No. 7*, 150 F. Supp. 3d 842, 849–50 (E.D. Mich. 2015). This is especially true when there has been sufficient opportunity for discovery. *Celotex Corp.,* 477 U.S. at 326.

The Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). The Court may rely on the parties to call attention to the specific portions of the record that demonstrate a genuine issue of material fact. *Wells Fargo Bank, N.A. v. LaSalle Bank N.A.*, 643 F. Supp. 2d 1014, 1022 (S.D. Ohio 2009).

### B.    Analysis

MAB asserts four claims against Channingway arising from the failed purchase of the Property: (1) breach of the PSA; (2) unjust enrichment; (3) fraud; and (4) declaratory relief.[9]  FAC ¶¶ 88–110, ECF No. 7.  Channingway responds with a counterclaim for declaratory relief and moves for summary judgment on all claims and the counterclaim.  ECF No. 31.  The Court addresses each below.

### 1.    MAB's Breach-of-Contract Claim

As recited above, the Court confines MAB's breach-of-contract claim to those theories contained in the FAC properly raised on summary judgment, which are that Channingway breached the PSA by providing materially untrue representations and warranties about the Property, failing to deliver required items and materials about the Property's occupancy, and refusing to cooperate in good faith to resolve disputes.  FAC ¶ 85, ECF No. 7.

"A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach."  *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018) (citations omitted); *see also Quest Workforce Sols., L.L.C. v. Job1USA, Inc.*, 75

---

[9] The Court applies Ohio law to MAB's state-law claims.  *See* PSA, ECF No. 46-16 at PAGEID # 931 (governing law provision stating that PSA "shall be interpreted, construed, applied and enforced in accordance with the laws of the state in which the Property is located"); *Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (citation omitted) ("Where neither party argues that the forum state's choice-of-law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.").

N.E.3d 1020, 1030 (Ohio Ct. App. 2016) ("To establish a breach of contract, the plaintiff must establish by a preponderance of the evidence that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted from that failure." (internal quotation marks and citation omitted)).  In this case, there exists a valid and enforceable agreement, but there remain genuine issues of material fact as to certain of Channingway's alleged breaches, such that summary judgment is inappropriate.

### a.      Existence of a Contract

The FAC alleges that the parties entered into the PSA and several Addenda thereo.  FAC ¶¶ 16, 21–24, ECF No. 7; *see also id.* ¶ 89 ("As described in the General Allegations, Plaintiff and Defendant had a valid and enforceable agreement.").  Nevertheless, in their opposition to Channingway's motion, MAB and Bauman argue that Channingway "failed to establish that . . . there was not fraudulent misrepresentation rendering the Contract unenforceable."  ECF No. 51 at PAGEID # 1521; *see also id.* at PAGEID # 1522 ("Bauman testified to multiple misrepresentations made by Defendant prior to execution of the Contract which may render the Contract unenforceable as there may not have been mutual assent to the terms or a mutual meeting of the minds to form a valid contract.");  *cf.* FAC ¶¶ 93–107, ECF No. 7 (levying unjust enrichment and fraud claims in the alternative).  So, the Court must first determine whether the PSA is a binding agreement before determining whether there is an issue of fact regarding

Channingway's breach.[10]  *See Mercantile Tr. & Deposit Co. v. City of Columbus*, 203 U.S. 311, 321 (1906) ("It cannot be determined that there is an impairment of the obligation of a contract until it is determined what the contract is, and whether it is a valid contract.").

"A contract is generally defined as a promise, or a set of promises, actionable upon a breach." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (citation omitted).  "Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Est. of Wiegert v. Am. Aeromotive Corp.*, No. 1:23-CV-234, 2025 WL 3214332, at *6 (S.D. Ohio Nov. 18, 2025) (quoting *Minster Farmers Coop. Exch. Co. v. Meyer*, 884 N.E.2d 1056, 1058 (Ohio 2008)).  "A meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.* (citation omitted).

Here, MAB and Bauman argue that Channingway produced inaccurate rent rolls that included non-existent tenants in an attempt to fraudulently

---

[10] The Court focuses on the PSA's validity because MAB does not allege in the FAC and MAB and Bauman do not argue in their summary judgment opposition that *the Addenda* are unenforceable.  *See generally* FAC, ECF No. 7 (alleging that Channingway "breached the Agreement"); *id.* at PAGEID # 63 (defining "Agreement" as the PSA); *see also* ECF No. 51 at PAGEID # 1521 (arguing that "fraudulent misrepresentation render[ed] the Contract unenforceable"); *id.* at PAGEID # 1505 (defining "Contract" as the PSA).  Although MAB raised the unenforceability of at least one Addendum at the motion-to-dismiss stage, *see* ECF No. 15, "[w]hen a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited," *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) (citation omitted).

misrepresent the Property's financial viability to interested buyers. ECF No. 51 at PAGEID ## 1513, 1521 ("As such, the inclusion of Channing Inc./Saimma Inc. and Jessica Walters Tactical Services in the Document Vault mislead Plaintiff as to the financial viability of the Property."); Bauman Dep. 45:5–7, 48:5–7, 49:8–21, ECF No. 46-1. These allegations ring of fraudulent inducement, which arises "when a party is induced to enter into an agreement through fraud or misrepresentation." *ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 578 (Ohio 1998). Fraud in the inducement results in a voidable contract. *Haller v. Borror Corp.*, 552 N.E.2d 207, 209 (Ohio 1990). To prove fraud in the inducement, a plaintiff must demonstrate that the defendant "made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to [its] detriment." *Id.* (citation omitted). "Fraudulent inducement must be proven by clear and convincing evidence." *Dayton Children's Hosp. v. Garrett Day, LLC*, 149 N.E.3d 1004, 1030 (Ohio Ct. App. 2019).

MAB and Bauman have not raised a genuine issue of material fact as to fraudulent inducement to invalidate the PSA. To support their assertions that Channingway "produced inaccurate rent rolls, . . . did not accurately disclose the tenants on the Property prior to executing the Contract[,] and further misrepresented leases in effect on the Property," ECF No. 51 at PAGEID # 1521, MAB and Bauman compare the leases contained in Ten-X's due diligence portal with the leases listed on the rent roll attached to Exhibit C of the PSA, *see id.* at

PAGEID # 1513.  MAB and Bauman identify discrepancies between these sources—for instance, a lease for a tenant named "Jessica Walters Tactical Services" was included in Ten-X's portal but not on the PSA's rent roll, "nor are there any payments shown for Jessica Walters Tactical Services in [Channingway's] balance sheet."  *Id.*; *see also* FAC ¶¶ 43–47, ECF No. 7 ("Exhibit C listed 21 'Total Occupied Units' and identified the tenants for those units.  The Ten-X website also identified 21 occupied units.  Exhibit C and the Ten-X did not contain the same tenants.").

But no reasonable juror could find that these discrepancies amount to clear and convincing evidence that Channingway fraudulently induced Bauman to enter into the PSA.  Initially, some inconsistencies in the two sources appear to have been expected.  At least a few weeks passed between when Bauman reviewed the Ten-X materials and when the parties entered the PSA.  *Compare* First Friedman Decl. ¶ 5, ECF No. 47-1 (stating that "Channingway decided to engage the online platform Ten-X to list the Property for sale" in "early 2021") *with* PSA, ECF No. 46-16 (executed April 9, 2021).  As Channingway notes, tenancy in large office buildings is fluid and subject to change, *see* ECF No. 54 at PAGEID # 1543.  Additionally, Exhibit C to the PSA explicitly indicates that there may not be complete overlap between the Ten-X portal and the rent roll, stating that "[a]ll leases posted to the Property's listing page on Ten-X's website (a) after the date of the attached list, and (b) before Buyer signs this Agreement are hereby incorporated herein by reference."  ECF No. 46-16 at PAGEID # 939.

The rent roll attached to Exhibit C is dated March 11, 2021, *see id.* at PAGEID # 940, but Bauman did not sign the PSA until nearly a month later.  So, there may be tenants listed on Ten-X's portal that are not specifically listed on the rent roll, though they are "incorporated" therein.[11]

What's more, simply because a person or entity was identified as a tenant on the Ten-X portal but not in the PSA's rent roll (or vice versa) does not mean that Channingway falsely or misleadingly represented the Property's occupancy. By way of example, Trish Wright was listed as a tenant on the PSA's rent roll but not identified on Ten-X's website.  *See* Bauman Decl. ¶ 7, ECF No. 51-1. Although Channingway probably should have added her to the Ten-X portal, her appearance in the PSA was accurate, as she was a rent-paying tenant at that time.  *See, e.g.*, ECF No. 47-1 at PAGEID # 1200 (reflecting rent payments by Trish Wright from January to August 2021).  Bauman also declares, among other things, that "[a] lease for Scott Henry was uploaded to the [Ten-X] document vault, however, Scott Henry was not identified as a current tenant in Exhibit C to the [PSA]."  Bauman Decl. ¶ 11, ECF No. 51-1.  But the rent roll in Exhibit C somewhat contradicts his declaration—Scott Henry is listed as having been a tenant from February 2020 to January 2021.  *See* PSA, ECF No. 46-16 at PAGEID # 942.

---

[11] Bauman offers a screenshot of the Ten-X portal but does not indicate when he took the screenshot.  *See* Bauman Decl., ECF No. 51-1 at PAGEID # 1528.

Nor have MAB and Bauman shown how any misrepresentation regarding the tenants at the Property was material.  Bauman points to several tenant discrepancies, but neither he nor MAB discuss the relative importance of the same to his ultimate purchase determination.  True, Bauman testified that "the tenants were [his] main concern" because the Property was "worthless without the tenant income."  Bauman Dep. 130:21–131:13, ECF No. 46-1.  But looking to tenant income, many of the allegedly misrepresented tenants were individuals who paid as low as \$200–\$300 a month in rent—as compared to larger, commercial tenants (about which MAB and Bauman do not complain) paying as much as \$6,500 a month.  *See* PSA, ECF No. 46-16 at PAGEID ## 940–42 (rent roll).  Moreover, both the Ten-X portal and the PSA's rent roll identified twenty-one tenants.  *See* FAC ¶¶ 43–44, ECF No. 7; PSA, ECF No. 46-16 at PAGEID ## 939–42.  The two lists may not have been the same, but it is not as if Bauman decided to bid on the Property using a Ten-X portal listing fifty tenants, only to be later faced with a rent roll including merely five tenants.

Accordingly, the Court finds that there is no genuine issue of material fact as to the existence and validity of the PSA and its Addenda.  The first element of MAB's breach-of-contract claim is thus established.

### b. Channingway's Alleged Breaches

In evaluating whether Channingway's conduct amounts to a breach, the Court's role "is to ascertain and give effect to the intent of the parties," which is "presumed to reside in the language they chose to employ in the agreement."

Case No. 2:23-cv-3083

*Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519, 526 (Ohio 1997) (citation omitted).  If the contract's terms are clear and unambiguous, "there is no issue of fact to be determined," and the Court must enforce the contract as written.  *Lincoln Elec. Co. v. St. Paul Fire & Marine Ins. Co.*, 210 F.3d 672, 683–84 (6th Cir. 2000) (applying Ohio law).  The Court must give common terms "their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument."  *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978).

The contract will require further analysis only if the Court finds the at-issue language ambiguous.  *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio Ct. App. 2003).  Contractual language is ambiguous "where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations."  *Id.*  "[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court."  *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law).

With these principles in mind, the Court turns to the PSA and Channingway's alleged breaches thereof.

### i.        Production of Instruments – Section 4(A)(v)

MAB first asserts that Channingway violated Section 4(A)(v) of the PSA, which concerns Channingway's deliveries.  This section states:

(A) <u>Seller's Deliveries</u>. On or before the Closing Date, Seller shall deliver the following to Closing Agent ("<u>Seller's Deliveries</u>") . . . (v) Any and all other instruments reasonably required by Closing Agent or otherwise necessary to Close the transactions contemplated by this Agreement.

PSA, ECF No. 46-16 at PAGEID # 926.  MAB contends that Channingway failed to deliver (1) bank statements, to be used by MAB's lender to verify rent rolls and obtain financing; (2) leases or lease amendments for certain tenants, including J.W. Hickey, OHM International, and Bresco; and (3) other leases for tenants identified in the Ten-X auction post for the Property, including U.S. Bank, A Lifestyle Service, Cornerstone Columbus, Homewatch Caregiver, Scott Henry, and Danayale Rutlin.  ECF No. 51 at PAGEID ## 1511–12.  The FAC further asserts that Channingway failed to provide "an updated rent roll and an update on the security deposit credit, if any."  FAC ¶ 34, ECF No. 7.

The plain language of Section 4(A)(v) does not obligate Channingway to hand over every conceivable document that might be useful for the transaction. Rather, the key question in determining whether Channingway breached Section 4(A)(v) is whether the bank statements, leases, and other documents that MAB seeks are "reasonably required by Closing Agent or otherwise necessary to Close the transactions contemplated by this Agreement."  PSA, ECF No. 46-16 at PAGEID # 926.  If so, Channingway needed to provide those materials to avoid a breach.

Looking first to the bank statements, MAB contends that Bauman needed them to obtain financing.  ECF No. 51 at PAGEID # 1512 ("As Plaintiff's receipt of

financing was necessary to close the transaction, Defendant had an obligation to supply this information under Section 4(A)(v) of the Contract."). Despite MAB and Bauman's representation to the contrary, *see id.* at PAGEID # 1511, nothing in the record indicates that the Closing Agent needed (or even requested) any bank statements.

Moreover, no reasonable juror could find that the bank statements were "otherwise necessary" to close on the Property. As MAB and Bauman admit, neither the PSA nor any Addenda included a specific financing contingency. *See* Bauman Dep. 94:15–95:1 ("Q. Did you know—did you know, prior to bidding on the property, that the contract would not include a financing contingency? A. Yes[.]"), 153:1–4 ("Q. . . . So Channingway did not agree to a financing contingency in this contract, right? A. In this specific contract, no."), ECF No. 46-1. MAB and Bauman further admit that they could have purchased the Property in cash (or via some other method) without first obtaining financing. *See id.* at 101:18–20 ("Q. Did Allan agree to pay the full purchase price in cash prior to bidding? A. Yes."), 174:11–19 ("Q. . . . [A]s of this May 21st email, you're acknowledging that the parties can close even if financing doesn't come through, right? A. Correct."); 218:16–219:7 (stating that he would be "stuck purchasing the property for cash as contractually agreed" if lender chose not to fund), 279:20–22 ("Q. Did you have the cash necessary to close on this transaction on September 1st? A. Yes."); *cf., e.g., id.* at 89:21–24 ("Q. So there are alternate funding sources, generally, to buy a commercial building besides an

SBA loan, right?  A.  Yes."), 137:8–18 ("Q. . . . So when you say SBA on the back end, does that mean after you had acquired the property with cash, you would have refinanced?  A.  Yeah.  We would have gotten financing against it, yeah."). Indeed, Bauman chose to engage a lender not out of necessity but because "it would just be more convenient."  *Id.* at 138:23–139:9.

Considering those admissions, the bank statements were not "reasonably necessary" to the transaction.  *See, e.g.*, Black's Law Dictionary (12th ed. 2024) (defining "necessary" as "[t]hat [which] is needed for some purpose or reason; essential" and "[t]hat [which] must exist or happen and cannot be avoided; inevitable"); Merriam-Webster's Collegiate Dictionary (12th ed. 2025) (defining "necessary" as "absolutely needed" or "required").  Section 4(A)(v) thus did not obligate Channingway to provide the bank statements.

The same analysis applies to the leases, for the most part.  MAB and Bauman argue that the Closing Agent explicitly advised that the title company needed leases to close.  ECF No. 51 at PAGEID # 1512.  They point to an August 2021 email exchange between the Closing Agent to Channingway in which the Closing Agent wrote:

> It looks like we don't have the original leases for J.W. Hickey, OHM International, Trish Wright or Kenneth Mcdonald dba Barber Shop. Please provide copies as soon as you can.  Also, the Bresco lease doesn't have subordination language so we'll need an SNDA from them.  If the other leases above have SNDA language, then we only need the SNDA from US Bank and Bresco.

ECF No. 50-2 at PAGEID # 1446.  In response, a Channingway representative attached the Wright and Barber Shop leases but wrote that the company did not "have a copy of J.W. Hickey or OHM International as these were not provided to use [sic] by the previous owner." *Id.*  The Closing Agent replied, "[W]e're in between a rock and a hard place without copes of the original JW Hickey Lease or the OHM International leases.  [Neither t]he buyers['] lender nor title can move forward with the SNDA's until we see copies of those leases." *Id.* at PAGEID # 1445.  The Closing Agent then corrected himself and wrote that he only needed the OHM International lease.  *Id.*

Later the same month, the Closing Agent wrote to Channingway that he "would require modifications" of the Bresco and J.W. Hickey leases "to include subordination language as discussed before[.]" ECF No. 51-2.  Before Channingway wrote back, the Closing Agent sent another email, stating that the SBA lender "has confirmed they do not need tenant lease agreements for Bresco and JW [H]ickey . . . .  Stewart Title needs lease amendments for Bresco and JW Hickey to include subordination language." *Id.*

These emails reflect that the Closing Agent's title company could not continue *with the SNDAs* until Channingway produced copies of the OHM International lease and amendments for Bresco and J.W. Hickey.  Although it does not appear that the parties deposed the Closing Agent (or the SBA lender, for that matter), a Channingway manager testified that the title company requested SDNAs only because the SBA lender wanted the title company to

execute a lender's policy.[12]  *See* Sofer Dep. 83:22–86:3, ECF No. 50-1; *see also* ECF No. 46-28 at PAGEID # 1070 (July 2021 approval letter from SBA lender stating that a "condition of funding" was for "[b]orrower to provide copies of any and all leases encumbering the subject property.  Subordination, Non-Disturbance and Attornment Agreements (SNDA) will be required for all leases"). And the PSA did not require SNDAs—indeed, Bauman admits that he would have been able to buy the Property for cash without getting SNDAs.  *See* Bauman Dep. 222:22–223:15, 279:1–5, ECF No. 46-1.  Likewise, Therefore, the leases that MAB and Bauman contend Channingway failed to provide were not "reasonably required by Closing Agent or otherwise necessary" to close on the Property, and Channingway has not breached Section 4(A)(v).

Accordingly, Channingway is entitled to summary judgment on MAB and Bauman's breach-of-contract claim, insofar as it asserts liability under Section 4(A)(v) of the PSA.

### ii.       Production of Instruments – Section 10(D)

The Court now turns to Section 10(D) of the PSA, which MAB alleges Channingway breached by failing to deliver accurate and complete copies of all

---

[12] Mortgage lenders often require consumers to purchase a lender's title insurance policy to protect the lender against any title defects.  *See, e.g.*, *Hickman v. First Am. Title Ins. Co.*, No. 1:07 CV 1543, 2008 WL 11380160, at *1 (N.D. Ohio Feb. 29, 2008) ("Lenders, who are the beneficiaries of the policies, generally require that title insurance be purchased in order to protect their collateral if a title challenge arises.").

leases for all tenants on the Property.  This section, included above but reproduced here for ease of reference, states:

> Except for the leases (including any amendments[)] listed in Exhibit C ("Leases"), Seller knows of no other agreement with respect to the occupancy of the Property that will be binding on Buyer after Closing, and to Seller's knowledge, the information on Exhibit C and copies of any Leases delivered by Seller to Buyer are true, correct and complete in all material respects.

PSA, ECF No. 46-16 at PAGEID # 929.

Under Section 10(D)'s plain language, then, Channingway made two representations: (1) Channingway knew of no other occupancy agreements that would be binding on MAB after closing; and (2) to Channingway's knowledge, the information in Exhibit C to the PSA and copies of any leases that Channingway gave to MAB are materially true, correct, and complete.  *Id.*

But, contrary to MAB and Bauman's position, Section 10(D) itself does not require Channingway to provide MAB with leases.  Instead, it merely mandates that any leases that Channingway chose to provide to MAB be "true, correct, and complete in all material respects."  *Id.*  So, even assuming that Channingway failed to present copies of certain leases, this conduct alone does not amount to a breach of Section 10(D).

However, there remains a genuine issue of material fact as to whether the leases that Channingway *did* give to MAB were complete and accurate.  On one side, Channingway insists that "all leases that existed were provided to Bauman via the Ten-X online portal or directly to him."  ECF No. 47 at PAGEID # 1174;

*see also* First Friedman Decl. ¶ 9 ("All of the tenant information, lease documentation, etc. that Channingway possessed were given to Bauman or were uploaded to Ten-X.").  On the other side, Bauman declares that Channingway provided only lease amendments or unexecuted leases for some tenants.  Bauman Decl. ¶ 15, ECF No. 51-1.  Consequently, there remains a fact issue on whether Channingway breached Section 10(D) by providing leases that were not complete in all material respects.  Summary judgment is **DENIED** as to this theory of liability.

### iii.       Good-Faith Cooperation – Section 5(C)

MAB's final theory of Channingway's breach relates to Section 5(C) of the PSA, which states:

> Duty to Cooperate in Good Faith to Resolve. Despite anything to the contrary in this Section, if either party learns that a closing condition is unlikely to be satisfied, such party shall promptly notify the other party, and both parties shall cooperate in good faith to fairly and promptly resolve the matter, and the party whose closing condition was not satisfied shall not be relieved of its obligation to Close unless (i) the other party fails to cooperate in good faith, (ii) fair and prompt resolution is not reached after the parties have cooperated in good faith, or (iii) fair and prompt resolution of the matter on or before the Closing Date would be impracticable.

PSA, ECF No. 46-16 at PAGEID # 927.  MAB argues that it made multiple requests for documents to close on the transaction, but each time, Channingway "took the position that it was not obligated to comply with these requests."  ECF No. 51 at PAGEID # 1518.  MAB continues that Channingway also refused to respond to MAB's questions about leases and tenants prior to executing the

Third Addendum.  *Id.*; *see also* ECF No. 50-2 at PAGEID # 1435 (email from Channingway representative stating, "[i]f we execute the circulated amendment today, we'll respond to your questions below and provide whatever we have").

As the Court found above, the PSA did not obligate Channingway to produce all of the materials that MAB and Bauman requested as a condition of closing on the Property, meaning that Channingway's position that it need not respond to their requests was not in bad faith.  *Cf. Oak Rubber Co. v. Bank One, N.A.*, 214 F. Supp. 2d 820, 833 (N.D. Ohio 2002) ("Ohio law is crystal clear that an actor does not act in 'bad faith' when it decides to enforce its contractual rights.").

Additionally, a review of the parties' communications and the PSA and Addenda indicate that Channingway's interpretation of the parties' relationship before the execution of the Third Addendum was correct.  The Second Addendum "amends and supplements" the PSA and controls if there is a conflict. ECF No. 46-29 at PAGEID # 1074.  Section N of the Second Addendum states, in relevant part, that "[MAB] shall have the option to further extend the Closing to a date no later than August 20, 2021, by providing written notice to [Channingway] of its intention to do so no later than July 21, 2021." *Id.* at PAGEID # 1075.  It was not until July 23, 2021 (two days after the deadline in the Second Addendum) that Bauman first notified Channingway that his lender would not be able to timely fund the purchase.  ECF No. 50-2 at PAGEID # 1442.  By then, the option to extend had expired, and closing on the Property never

occurred.  That Channingway declined to engage with MAB and Bauman after the expiration of their agreement does not amount to a lack of good faith.

There remains a genuine issue of material fact, however, as to whether Channingway fully complied with Section 5(C)'s good-faith obligation.  This goes back to the factual issue of whether Channingway provided complete and accurate copies of various leases.  Channingway represented as much in Section 10(D), and one of the conditions precedent to closing is that "[a]ll representations and warranties of [Channingway] in this Agreement shall have been true in all material respects as of the Effective Date."  PSA, ECF No. 46-16 at PAGEID # 927 (Section 5(B)).  If Channingway knowingly provided only portions of leases, it presumably would know that a closing condition was unlikely to be satisfied and had the duty to engage in good faith with MAB and Bauman.

Therefore, summary judgment is **DENIED** as to this theory of liability.

### c.    MAB and Bauman's Performance

The third element of MAB's breach-of-contract claim concerns its performance.  Channingway argues that MAB and Bauman never tendered performance (because the Property never closed), which defeats MAB's claim. ECF No. 47 at PAGEID # 1178.  MAB retorts that Channingway's prior material breaches excused MAB from performance and that the conditions precedent to MAB's obligation to close had not been satisfied.  ECF No. 51 at PAGEID ## 1518–19.

"[F]or the plaintiff to place the defendant in breach, the plaintiff must tender performance of his obligation and demand performance by the defendant of the reciprocal obligation." *Ligman v. Realty One Corp.*, No. 23051, 2006 WL 2788598, at *1 (Ohio Ct. App. Sept. 29, 2006); *see also Thomas v. Matthews*, 113 N.E. 669, syllabus (Ohio 1916) ("Where a plaintiff seeks to recover damages for breach of contract, the burden is upon him to show either substantial performance or tender of performance of the conditions on his part to be performed."). Plaintiff has the burden to demonstrate performance or establish a legally sufficient reason for failing to perform. *Ligman*, 2006 WL 2788598, at *1.

Here, there is no dispute that MAB did not perform its obligation to close on the Property. Nor could there be—MAB (through Bauman) requested three extensions due to a lack of financing before unilaterally cancelling the fourth closing after the SBA lender would not offer funds.

But MAB argues that it was not required to perform because Channingway breached the PSA. The Court has outlined Channingway's asserted breaches above. The only at-issue breaches (about which genuine issues of fact remain) stem from Channingway's alleged provision of incomplete or inaccurate leases. Although Ohio recognizes the doctrine of first material breach, the Court doubts that a reasonable juror would consider this conduct to be material. *See, e.g.*, *Price v. KNL Custom Homes, Inc.*, 28 N.E.3d 640, 651 (Ohio Ct. App. 2015) (defining material breach as "a failure to do something that is *so fundamental* to a contract that the failure to perform defeats the essential purpose of the contract

or makes it impossible for the other party to perform" (citation omitted) (emphasis in original)).

A review of the PSA, however, reveals that MAB's obligations to close (i.e., perform) was "conditioned upon" several items. *See* PSA, ECF No. 46-16 at PAGEID # 927. One such condition, located in Section 5, requires that "[a]ll representations and warranties of [Channingway] in this Agreement shall have been true in all material respects as of the Effective Date." *Id.* But, as the Court noted above, there is an issue of fact as to whether Channingway's representation about the leases in Section 10(D) was true. The lack of clarity surrounding Channingway's representations also makes unclear the extent (if any) of Channingway's satisfaction of the condition precedent to MAB's obligation to close. "If a condition precedent is not met, a party is excused from performing the duty promised under the contract." *United Fire & Cas. Co. v. AMS, Inc.*, No. 1:15-CV-515, 2016 WL 3542449, at *3 (S.D. Ohio June 29, 2016) (citing *Campbell v. George J. Igel & Co., Inc.*, 3 N.E.3d 219, 223 (Ohio Ct. App. 2013)). Accordingly, a fact issue remains as to MAB's performance, and summary judgment is **DENIED**.

### d. Waiver

Channingway finally argues that MAB and Bauman waived any breaches that allegedly occurred prior to the execution of the Second Addendum (July 12, 2021). ECF No. 47 at PAGEID # 1179. Because the pertinent language is ambiguous, however, summary judgment is not warranted.

In support of its position, Channingway points to language in the Second Addendum:

> Buyer hereby acknowledges that Seller shall not be required to perform any repairs and / or improvements to the Property.  Buyer hereby accepts the property in its "AS IS, WHERE IS" condition on this date or on the date of closing.  Buyer hereby acknowledges that Seller has satisfied all of its obligations and Seller shall have no further obligations to Buyer.

ECF No. 46-29 at PAGEID # 1075.  The Court previously found, at the motion-to-dismiss stage, that the plain language of the above provision created an illusory contract.  O&O, ECF No. 27 at PAGEID # 400 ("Defendant could not have satisfied all of its obligations before entering the Second Addendum, because Defendant still had a duty to close." (emphasis in original)).

On summary judgment, Channingway proposes interpreting the provision to mean that Channingway had performed all of its obligations under the PSA prior to the execution of the Second Addendum, save one future obligation to sell the Property on July 26, 2021 (the closing date).  ECF No. 47 at PAGEID # 1181. This construction, Channingway reasons, gives the provision meaning and results in a contractual waiver of any claims for breach (unless Channingway failed to sell the Property).  *Id.*; ECF No. 54 at PAGEID ## 1535–36 ("Plaintiff agreed that Channingway had no further obligations except to sell and that Plaintiff was buying as-is, yet now Plaintiff is alleging Channingway had further obligations and that, essentially, Plaintiff was not buying as-is.").

Plaintiff, however, maintains that Channingway's lingering duty to sell the Property meant that its obligations related to accomplishing closing remained intact and subject to breach. ECF No. 51 at PAGEID # 1520 ("Simply put, if [Channingway] still had a duty to close on the Contract, [Channingway] still had a duty to produce all documents and information required to close on the Contract and to cooperate in good faith to close on the Contract.").

Both parties' interpretations are reasonable. On one side, Channingway's proposed construction does give meaning to the provision and does not result in an illusory promise. The proposed interpretation also considers the plain language of the Second Addendum, which states that its terms "supersede and control" in the event of a conflict with the PSA. ECF No. 46-29 at PAGEID # 1074. Insofar as the PSA imposes additional obligations that do not square with the Second Addendum, the latter's "as-is" language would seemingly win.

On the other side, there are numerous obligations and provisions in the PSA that do not conflict with the Second Addendum. For instance, as detailed above, the parties' respective obligations to close were conditioned on the truth of several representations. The at-issue language is also located immediately after a statement about only Channingway's responsibility to perform repairs or improvements on the Property, *see* ECF No. 46-29 at PAGEID # 1075, and "a word is known by the company it keeps," *Yates v. United States*, 574 U.S. 528, 543 (2015). Applying this canon could reasonably result in an interpretation that

Channingway had no other obligations as to the Property's condition but retained obligations as to other facets of the Property encompassed in the PSA.

Because the Court finds that both interpretations are reasonable, the language is ambiguous. *See Covington*, 784 N.E.2d at 190. The parties have not offered any substantial arguments about parol evidence, so the Court concludes that summary judgment is not warranted.

**2.      MAB's Fraud and Unjust Enrichment Claims**

The Court determined above that there exist valid and enforceable agreements in this case—namely, the PSA and its Addenda. As such, the Court **GRANTS** summary judgment in Channingway's favor on MAB's unjust enrichment claim. *See, e.g.*, *Bergmoser v. Smart Document Sols., LLC*, 268 F. App'x 392, 396 (6th Cir. 2008) ("A party cannot prevail on a theory of unjust enrichment when an express contract has been formed." (citing *Delicom Sweet Goods of Ohio, Inc. v. Mt. Perry Foods, Inc.*, No. 04 CA 4, 2005 WL 525185, at *4 (Ohio Ct. App. Mar. 2, 2005))).

The Court also previously noted its assumption that MAB "pleads its unjust enrichment and fraudulent inducement claims in the alternative to its breach-of-contract claim." O&O, ECF No. 27 at PAGEID # 401. So, the Court construed the FAC as alleging that if the PSA "is unenforceable based on fraudulent inducement, then Plaintiff seeks to recover under its unjust enrichment and

fraudulent inducement claims."[13]  *Id.*  Neither MAB nor Bauman challenged the Court's understanding of MAB's claims on summary judgment.  Further, MAB and Bauman's fraud-related arguments in their summary judgment opposition only go to fraudulent inducement.  *See* ECF No. 51.  Construing MAB's fraud claim as one for fraudulent inducement and hearing no disagreement with that construction from MAB or Bauman, the Court **GRANTS** summary judgment in Channingway's favor on MAB's fraud claim for the reasons explained above.

### 3.    MAB's Declaratory Judgment Claim

Finally, MAB seeks a judicial determination that (1) MAB's initial payments are not enforceable liquidated damages; and (2) Channingway's retention of MAB's initial payments constitute an unenforceable penalty.  ECF No. 51 at PAGEID # 1522 (citing FAC ¶ 110, ECF No. 7); *see also* ECF No. 15 at PAGEID # 351 ("[Channingway's]'s retention of [MAB]'s initial deposit of $236,900.00 and

_____

[13] Channingway argues that MAB and Bauman's fraud allegations are the same as those that underly their breach-of-contract claim, such that MAB and Bauman are improperly attempting to "transform contractual duties into tort claims"  ECF No. 54 at PAGEID # 1550.  True, "under Ohio law, the existence of a contract action generally excludes the opportunity to present the same case as a tort claim."  *Wolfe v. Cont'l Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981).  However, "[a] tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action [ ] if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed."  *Infocision Mgmt. Corp. v. Found. for Moral L. Inc.*, No. 5:08CV1342, 2009 WL 2244166, at *4 (N.D. Ohio July 27, 2009).  "The common-law duty not to deceive a party into entering the contract or agreement is, thus, independent and separate from a duty not to breach a contractual obligation."  *Starlion Elecs. Distribution, LLC v. JDS Pro Health LLC*, No. 1:24-CV-1186, 2025 WL 606521, at *10 (N.D. Ohio Feb. 25, 2025).  In other words, MAB and Bauman's allegations surrounding Channingway's pre-contractual conduct is distinct from their breach-of-contract claim premised on Channingway's actions under the agreement.

its two subsequent deposits of $118,450.00 each is unlawful."). MAB argues that Channingway "committed multiple violations of the Contract which entitle [MAB] to a return of the Deposits."[14] *Id.*

The Court previously found that the earnest money provision is not a liquidated damages clause, O&O, ECF No. 27 at PAGEID # 397, so the Court **DENIES** summary judgment to Channingway on the first portion of MAB's declaratory judgment request.

Taking one step further, though MAB did not move for summary judgment on its declaratory judgment claim, the Court concludes that MAB is nonetheless entitled to summary judgment on this portion thereof. Considering the Court's prior Order at the motion-to-dismiss stage, Channingway was arguably on notice that the Court could grant summary judgment for MAB. *See Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953, 959–60 (6th Cir. 2007) (observing that the key inquiries in determining whether to *sua sponte* grant summary judgment are "whether the losing party was on notice that [it] had to muster the necessary facts to withstand summary judgment" and whether "the losing party [can] demonstrate prejudice"). Summary judgment is the time for the moving party to, in the Sixth Circuit's parlance, "put up or shut up." *Street v. J.C. Bradford & Co.*,

---

[14] In the alterative, MAB posits that "the Contract is unenforceable due to [Channingway's] fraudulent misrepresentations[,] and [MAB] is entitled to return of the Deposits under either fraud or unjust enrichment." ECF No. 51 at PAGEID # 1522. MAB's alternative argument fails because its fraud and unjust enrichment claims may not proceed in tandem with a valid, enforceable agreement.

886 F.2d 1472, 1478 (6th Cir. 1989).  Channingway was thus on notice that it must "come forward with all its evidence" and has had a reasonable opportunity to respond as to this issue.  *Sumner v. Armstrong Coal Co.*, 533 F. App'x 583, 588 (6th Cir. 2013).  Accordingly, summary judgment is **GRANTED** in MAB's favor.

As to the second declaration that MAB seeks, the Declaratory Judgment Act provides that a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 938 (S.D. Ohio 2012) (quoting 28 U.S.C. § 2201(a)).  Courts have discretion to decide whether to entertain a declaratory judgment action and routinely "deny declaratory relief if an alternative remedy is better or more effective."  *Grand Trunk W. R.R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (citing cases).  Courts also consistently find that declaratory relief is inappropriate when "claims have already ripened into a cause of action."  *Miami Valley*, 852 F. Supp. 2d at 938.

MAB asks the Court to declare that Channingway's retention of MAB's initial payments constitutes an unenforceable penalty.  This issue is undeniably subsumed by the breach-of-contract dispute.  The PSA states that Bauman's initial earnest money deposit—$236,900.00, *see* Bauman Dep. 169:7–17, ECF No. 46-1—"is non-refundable" unless Channingway "is the breaching party," in which case the "Closing Agent shall return the Earnest Money Deposit to [MAB],"

PSA, ECF No. 46-16 at PAGEID ## 926, 928.  Whether Channingway is the breaching party is connected with MAB's breach-of-contract allegations.  With respect to the remaining deposits (the two $118,450 payments in executing the Addenda), whether they constitute non-refundable consideration, as Channingway argues, depends on construction of the contracts, which are also at issue in MAB's breach-of-contract claim.

MAB's declaratory judgment claim has already ripened into a cause of action for breach of contract, such that declaratory judgment on these issues is "duplicative and unnecessary."  *Gregor v. Rice Drilling D, LLC*, No. 2:21-CV-3999, 2024 WL 169119, at *4 (S.D. Ohio Jan. 16, 2024).  Accordingly, the second portion of MAB's declaratory judgment request is **DISMISSED**.

### 4.  Channingway's Declaratory Judgment Counterclaim

Section 13(J) of the PSA provides that "[i]n any action, proceeding or arbitration arising out of this Agreement, the prevailing party (defined as the party who prevails as to a substantial part of the litigation or claim) shall be entitled to reasonable attorneys' fees and costs."  PSA, ECF No. 46-16 at PAGEID # 931. Given this provision, Channingway counterclaimed against MAB and filed a third-party complaint against Bauman, seeking a declaration that Channingway is the prevailing party and entitled to recover its fees.  Channingway now moves for summary judgment on its declaratory judgment counterclaim.  ECF No. 47.

Genuine issues of material fact prevent the Court from declaring that Channingway is the prevailing party.  Thus, the Court **DENIES** summary judgment in Channingway's favor on its counterclaim.

## V.  CONCLUSION

Having fulsomely reviewed the materials submitted in this case, the Court is struck by the cagey and roundabout nature of the parties' deal surrounding the Property.  Both sides could have been more forthright about their intentions and knowledge about the Property's value.

That said, for the foregoing reasons, MAB and Bauman's motion to strike, ECF No. 55, is **DENIED as moot**.  Channingway's motion for summary judgment, ECF No. 47, is **GRANTED in part** and **DENIED in part** as follows:

- The motion is **GRANTED** in Channingway's favor as to MAB's breach-of-contract claim (Count I) based on Section 4(A)(v) of the PSA, MAB's unjust enrichment claim (Count II), and MAB's fraud claim (Count III).

- The motion is **DENIED** as to the first declaration that MAB seeks in its declaratory judgment claim (Count IV), but the Court *sua sponte* **GRANTS** summary judgment to MAB on that declaration.  The portion of MAB's declaratory judgment claim seeking the second declaration is **DISMISSED**.

- The motion is **DENIED** as to Channingway's declaratory judgment counterclaim and MAB's breach-of-contract claim (Count I) based on Sections 10(D), 5(C), and 12 of the PSA.

Accordingly, the claims that remain for trial include (1) MAB's breach-of-contract claim—insofar as it concerns whether Channingway's alleged failure to provide complete and accurate leases breached Sections 10(D) and 5(C) of the PSA, whether Channingway's mediation conduct breached Section 12, whether Section 5 affects MAB's performance obligations, and whether Channingway's retention of MAB's initial payments constitutes an unenforceable penalty—and (2) Channingway's counterclaim.

The parties are **ORDERED** to jointly notify the Court, **WITHIN THIRTY DAYS** of the date of this Opinion and Order, whether they wish to mediate before trial.  Should the parties wish the Undersigned or a member of his staff to perform the mediation, they must include a statement to that effect in the joint notice.  Upon receiving the notice, the Court will set a trial date on the remaining claims unless the parties intend to mediate or the parties express any intent to dismiss the remaining claims.

The Clerk shall terminate ECF Nos. 47 and 55.

**IT IS SO ORDERED.**

_____
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**